[Civ. No. 14010.   Second Dist., Div. One.   Aug. 9, 1943.]

NANCY M. COLLIER, a Minor, etc., et al., Appellants, v. LOS ANGELES RAILWAY COMPANY (a Corporation) et al., Respondents.

170

A. J. O'Connor for Appellants.

Gibson, Dunn & Crutcher and E. H. Chapman for Respondents.

WHITE, J.—This action was instituted by the surviving spouse and two minor children of Leon Collier to recover damages for the claimed wrongful death of the latter which it was alleged resulted from negligence upon the part of de-

fendants. By their answer defendants denied any negligence and by way of a further and separate defense charged that decedent himself was guilty of contributory negligence. Trial was had before a jury resulting in a verdict for the defendants. From the judgment entered thereon plaintiffs prosecute this appeal.

The accident out of which this litigation arose occurred about midnight on December 13, 1940, and involved a collision between a streetcar of defendant railway company and an automobile driven by the decedent husband and father of plaintiffs. The accident happened at the intersection of First and Anderson Streets in the city of Los Angeles.

While conceding that the evidence was in sharp conflict as to the issue of decedent's contributory negligence, appellants contend that the physical facts shown in evidence are consistent only with the conclusion that the sole, proximate cause of the fatal accident was the speed at which the streetcar was operated by defendant motorman. In epitomizing the factual background of this litigation, we shall therefore state not only the facts which tend to support the verdict rendered but shall also set forth the facts relied upon by appellants. Narrated in that form, we feel it may fairly be stated that the record discloses that First Street, in the area here involved and particularly at the intersection of Anderson Street, is protected by boulevard stop signs which require vehicles entering First Street from either the north or south on Anderson Street to come to a stop before making such entry. The streetcar here involved was of the modern type commonly known as the "streamliner P.C.C.," equipped with four 55-horsepower motors and weighing 36,000 pounds and equipped with three sets of brakes, viz., air, mechanical and electric. The streetcar was 46 feet in length. According to the testimony of the motorman, as he approached Anderson Street he had attained a speed of approximately 20 miles an hour, the bell was ringing and the headlight and the night lights were burning. At a point some 30 to 40 feet west of Anderson Street, the motorman first observed the lights of the deceased's automobile, which was then more than a half a block away, approaching from the south. When the streetcar reached the curb line of Anderson Street, the motorman observed the automobile was about 100 feet south of First Street, and according to his estimate, was traveling at approximately 65 miles an hour.

He immediately applied his brakes in full emergency; i. e., the air, mechanical and electric brakes, but the automobile without diminishing its speed and without making the boulevard stop, continued north and violently collided with the right front portion of the streetcar, causing the latter to be immediately derailed. According to the motorman's testimony, from the time he was first able to estimate the position and speed of the automobile, he had but 20 feet within which to stop. The testimony of the motorman was corroborated by two witnesses who were passengers on the streetcar. One of them testified that he first saw the automobile as the street car was entering the intersection, at which time the former was 20 to 30 feet south of the boulevard stop line and that the automobile did not make the boulevard stop. He corroborated the motorman's testimony that the bell on the streetcar was sounded as it approached the intersection; that the right front doors of the streetcar were damaged in the collision so that they could not be opened after the impact, and also as to the application of the brakes on the streetcar prior to the collision. The other witness testified that the automobile was past the boulevard stop sign when he first observed it, at which time it was traveling at a rate of speed which he estimated to be between 25 and 30 miles per hour. This witness also testified that the bell was rung as the streetcar approached the intersection and that the brakes were applied before the impact. There was also testimony given by the chemist for the coroner's office of Los Angeles County and by Dr. Louis J. Gogal, autopsy surgeon in the Los Angeles County Coroner's office, that on the day following the death of decedent an examination of his blood showed that the same contained .09 or 1/100th of 1% ethanol, or grain alcohol, and that at the time of the accident such content amounted to "perhaps about .10, or slightly over that," and that the percentage of this ethanol, or grain alcohol, "indicated that the man was under the influence of alcohol; that is, there was present so much alcohol in his blood, while he would not have reached the point we consider as acute intoxication. If you take a large amount in the average man, which has been stated to be .15 per cent, he would be under the influence of alcohol." It should be noted that on cross-examination the doctor testified "I don't think that the average person is actually intoxicated at .09" and when asked "Q. And Doctor, as a scientific medical man, before you passed an opinion on whether or not an individual was under the influence, with a

finding of .09, you would want to know something else about the person, wouldn't you? A. Well, not necessarily; if we go by practice and tests that have been made and cases reported, .09 or .10 is sufficient alcohol in the blood to indicate that there are certain reaction changes in the average person that would take place. It is true that there are differences in people's reaction to alcohol; that would depend somewhat upon the aspect of tolerance, but in certain situations and with certain tests, the average person, with a presence of .09 or .10, would be definitely impaired in his reactions in a certain sense and would be considered as under the influence of alcohol to a certain degree.''

The only testimony contrary to the foregoing was that given by a witness produced by the plaintiffs who testified that deceased did observe and make the boulevard stop; that ''The street car hit the left side of the automobile about amidship.'' Appellants in their brief contend that this witness testified that the streetcar was going about 55 miles per hour at the time of the collision while the automobile was traveling about 8 or 10 miles per hour. However, an examination of the record indicates that for good and sufficient reasons the testimony given as to the speed of the streetcar was stricken out by the trial court.

Appellants contend that certain physical facts such as photographic evidence that the streetcar ran into the left side of the automobile, coupled with the fact that it was shown that the streetcar traveled 135 feet from the point of impact, brushed a telephone pole, hurdled the north curb and side walk on the north side of First Street and came to rest leaning against a telephone pole; that the front of the streetcar was facing in a northeasterly direction while the automobile was facing southwesterly, parallel with the streetcar, all indicate that the streetcar ran into the left side of the automobile. In connection with appellants' implied claim that certain physical facts tend to render inherently improbable the testimony of the motorman and witnesses corroborating him as to the contributory negligence of the decedent and the manner in which the accident occurred, we are not greatly impressed with these arguments for as was said in *Nagamatsu* v. *Roher*, 10 Cal.App.2d 752, 755, 756 [53 P.2d 174], ''As has been frequently pointed out in cases of this nature such arguments are unreliable because they fail to take into account the human element . . . 'perhaps there is nothing more certain about

an automobile accident than the fact that the visible results afterward are not an infallible guide in determining what occurred.' " In any event before evidence can be disregarded as inherently improbable there must exist a physical impossibility of the evidence being true, or its falsity must be apparent without any resort to inferences or deductions (*Arundel* v. *Turk,* 16 Cal.App.2d 293, 295, 296, 297 [60 P.2d 486]). No such showing appears in the case at bar. Since the record discloses substantial testimony to warrant the jury in finding that the proximate cause of the accident was the undoubted negligence of the decedent, we are not authorized to disturb such finding, and manifestly such a finding, sustained as it is by the evidence as to the contributory negligence of the decedent, supports the verdict in favor of the defendants even though it be conceded that the motorman was guilty of a violation of a city ordinance regulating the speed of streetcars. ·

■ Appellants, however, contend that in the giving of certain instructions and the refusal to give others proffered by them, the court fell into error which militated prejudicially against their substantial rights. In this connection it is asserted that appellants were entitled to have the jury instructed that at the time here in question decedent obeyed the law and exercised due care for his own safety (subds. 1 and 4, sec. 1963, Code Civ. Proc.). While it is true the court declined to give the instruction offered by appellants upon this subject, nevertheless of its own motion the court instructed the jury as follows: "At the outset of this trial, each party was entitled to the presumptions of law that every person takes ordinary care of his own concerns and that he obeys the law. · These presumptions are a form of prima facie evidence and will support findings in accordance therewith, in the absence of evidence to the contrary. When there is evidence that conflicts with such a presumption, it is the jury's duty to weigh that evidence against the presumption and any evidence that may support the presumption, to determine which, if either, preponderates. Such deliberations, of course, shall be related to, and in accordance with, my instructions on the burden of proof."

Appellants, however, contend that the instruction given by the court was erroneous because by it the presumption of due care was made applicable not only to the decedent but as well to the motorman operating the streetcar. This claim is

grounded on appellant's contention that "negligence and proximate causation were clearly established against defendants ... the motorman had admitted his negligence before the jury ..."; that proof of such negligence being wholly irreconcilable with the presumption in question, the latter was dispelled and disappeared from the case (*Mar Shee* v. *Maryland Assurance Corporation*, 190 Cal. 1, 9 [210 P. 269]). Conceding that the giving of the instruction, insofar as it applied to defendant motorman, was error, we are not impressed that it was a prejudicial error. The jury was told in plain and unequivocal language that while the presumption was a form of prima facie evidence, it would only support findings in accordance therewith "in the absence of evidence to the contrary"; that it was the duty of the jury to weigh any such contrary evidence against the presumption as well as any evidence that might support it, and "to determine which, if either, preponderates." The jury heard the evidence produced by each party for or against the guilt or innocence of each party mentioned in the instruction, according to the respective contentions of each, and we must assume from the language of the instruction that each juror understood the limitations placed upon the application of the presumption and that its force was dissipated by satisfactory "evidence to the contrary." If we adopt appellants' claim with reference to what the evidence showed as to negligence on the part of the motorman, it can only be said that the effect of giving the instruction was merely to instruct on a subject that was not present in the trial of this action. It could not have been prejudicial (*Medeiros* v. *Soares*, 17 Cal.App.2d 176, 178 [61 P.2d 501]; *Sitkei* v. *Ralphs Grocery Co.*, 25 Cal.App.2d 294, 295, 297 [77 P.2d 311]). Two additional instructions dealing with the aforesaid presumption, and the limitations applicable thereto, one requested by appellants and the other by respondents, were also given by the court.

Finally, appellants charge error upon the part of the trial court in giving the following instruction to the jury: "General human experience supports the inference that when one looks in the direction of an object clearly visible, he sees it, and that when he listens, he hears that which is clearly audible. When there is evidence to the effect that one did look, but did not see that which was in plain sight, or that he listened, but did not hear that which he could have heard in the exercise of ordinary care, it follows that either there

is an irreconcilable conflict in such evidence, or the person was negligently inattentive.''

In their attack upon this instruction appellants urge that there was no evidence, direct or indirect, that the decedent looked and failed to see the streetcar or listened and did not hear it. It will, of course, never be known whether the deceased actually did look or listen, but it must be conceded that it was his duty to do so, for to say nothing of the boulevard stop which decedent was required by law to make, and of the fact that he failed to make it, there is creditable evidence, a railway track is in and of itself a sign of danger, and it is the duty of one about to cross it to utilize his faculties of sight and hearing in order to apprise himself as to whether cars are approaching (*Badostain* v. *Pacific Elec. Ry. Co.*, 83 Cal.App. 290, 295 [256 P. 576]). It was therefore proper for the court to instruct the jury as to the obligation resting upon decedent to look and listen as he approached the tracks because if he did look he undoubtedly saw the streetcar for, undeniably, it was approaching the intersection, and if he did look, saw the car and attempted to cross immediately in front of it in violation of the dictates of ordinary prudence and care, he was negligent. And if he looked and listened but failed to see or hear the oncoming streetcar he was equally guilty of negligence. There was substantial evidence in the instant case to justify a conclusion on the part of the jury that the deceased either did not look and did not listen (or he must have seen or heard the approaching streetcar), or that, if he did look and listen, he looked with unseeing eyes and listened with unhearing ears. Manifestly, under no reasonable construction of the evidence could appellants have been prejudiced by the challenged instruction.

Furthermore, from a reading of the transcript of the evidence herein, we are impressed with the fact that the verdict of the jury could as well have been based upon an entire lack of negligence upon the part of the defendants as upon the contributory negligence of the deceased. When such a situation is presented, an appellate tribunal will not look behind the verdict in an attempt to ascertain the theory adopted by the jury (*Schultheiss* v. *Los Angeles Ry. Corp.*, 11 Cal. App.2d 525, 528 [54 P.2d 49]).

From the foregoing it follows that the judgment should be affirmed, and it is ordered.

York, P. J., and Doran, J., concurred.